

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0310-23

### EX PARTE JOHN MORGAN STAFFORD, Appellant

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### COLLIN COUNTY

MᶜCLURE, J., delivered the opinion of the Court in which HERVEY, RICHARDSON, NEWELL, WALKER and SLAUGHTER, JJ., joined. KELLER, P.J., filed a concurring opinion in which RICHARDSON, NEWELL, and SLAUGHTER, JJ., joined. KEEL, J., concurred. YEARY, J., filed a dissenting opinion.

### O P I N I O N

The State of Texas has an interest in regulating campaign elections to protect the rights of Texans to cast a meaningful vote. One such effort made by the Texas Legislature has been to adopt laws requiring disclosure to be made in political advertisements. Under Election Code § 255.004(b), a person commits an offense if, "with intent to injure a candidate or influence the result of an election, the person knowingly represents in a

campaign communication that the communication emanates from a source other than its true source." We granted the State's Petition for Discretionary Review to determine whether § 255.004(b) of the Texas Election Code, also known as the True Source of Communications statute, or True Source Statute, passes constitutional muster. We hold that it does not.

## I. BACKGROUND

Appellant, who identifies himself as a Democratic Party Activist and former candidate for Plano City Council, was accused of sending text messages with the appearance of coming from a Republican or conservative campaign with the intent to injure a candidate or influence an election. More specifically, Appellant sent out a text message identifying the Republicans in local nonpartisan races. Ultimately, Appellant was indicted for violating Section 255.004(b) of the Texas Election Code, which prohibits knowingly representing in a campaign communication that the communication emanates from a source other than its true source. The indictment alleged that Appellant:

> then and there, with intent to injure a candidate or inuence [sic] the result of an election, namely candidates Lily Bao, and Anthony Ricciardelli, and Justin Adcock, and Howard Smith, and Lynn Walling, and Joyce Loughrayi, the defendant knowingly represents in a campaign communication that the communication emanates from a source other than its true source, to wit, sending text messages with the appearance of coming from a Republican or conservative campaign.

In response to the indictment, Appellant filed a pretrial application for writ of habeas corpus, contending that § 255.004(b) was unconstitutional because it sought to regulate core political speech and was not narrowly tailored to serve an overriding state interest.

The trial court conducted a hearing on the motion at which Appellant and the State presented arguments. After the hearing, the trial court issued a written order denying the application.

## II.     DIRECT APPEAL

Appellant appealed, arguing that the trial court erred because the statute abridged the First Amendment right to free speech because: (1) it is not narrowly tailored to serve compelling state interests, (2) it is unconstitutionally vague, and (3) it places an undue burden on the right to anonymous speech. The Court of Appeals agreed that the statute was not narrowly tailored so it did not survive strict scrutiny. *Ex parte Stafford*, 667 S.W.3d 517 (Tex. App.—Dallas 2023). In particular, the appellate court found that the statutory restrictions are not limited to communications that are false, and its "expansive reach" is problematic and "demonstrates less than precise tailoring to achieve the state's objectives." *Id*. at 527. It held the statute unconstitutional and ordered the trial court to dismiss the indictment.

## III.     STATE'S PETITION FOR DISCRETIONARY REVIEW

We granted the State's petition for review. The State argues that § 255.004(b) is narrowly drafted and survives strict scrutiny. It says the Court of Appeals misread the statute to require identification of a source when the plain language merely prohibits identifying a false source. The State contends the appellate court erred by (1) misidentifying the State's interest, (2) determining that another statute achieved that

interest, (3) conflating facial unconstitutionality with overbreadth, and (4) relying on an inadequate less-restrictive means.

## IV.  ANALYSIS

### 1.  STANDARD OF REVIEW

Whether a statute is facially constitutional is a question of law that we review *de novo*. *See Ex parte Lo*, 424 S.W.3d 10, 14 (Tex. Crim. App. 2013). A facial challenge attacks the statute itself rather than the statute's application to the defendant. *Peraza v. State*, 467 S.W.3d 508, 514 (Tex. Crim. App. 2015). To mount a successful facial constitutional challenge, the challenger must establish that no set of circumstances exists under which the statute would be valid or that the statute lacks any plainly legitimate sweep. *Id.*; *see also United States v. Stevens*, 559 U.S. 460, 472, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010).[1]

When the constitutionality of a statute is attacked, we usually begin with the presumption that the statute is valid, and that the Legislature has not acted unreasonably or arbitrarily. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002). Generally, a person challenging a statute has the burden to establish its unconstitutionality. *Id*. But when the government seeks to restrict and punish speech based on its content, the usual

---

[1] A challenger may also bring a "substantial overbreadth" challenge to a state statute. Under such a challenge, a statute may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473; *see also Ashcroft v. Free Speech Coal*., 535 U.S. 234, 255, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002) (overbreadth doctrine prohibits government from banning unprotected speech if substantial amount of protected speech is prohibited or chilled in process). The instant case is a traditional facial challenge, not an overbreadth challenge.

presumption of constitutionality is reversed. *Ex parte Nyabwa*, 366 S.W.3d 719, 724 (Tex. App.—Houston [14th Dist.] 2011, pet ref'd) (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (1999)).

A law is "content-based" if it distinguishes between favored and disfavored speech based on the views expressed or if it is necessary to review the content of the speech to determine whether the speaker violated the law. *Ex parte Thompson*, 442 S.W.3d 325, 345 (Tex. Crim. App. 2014). A content-based regulation that distinguishes favored from disfavored speech based on the views expressed is presumptively invalid, and the government bears the burden to rebut that presumption. *Lo*, 424 S.W.3d 10, 15 (Tex. Crim. App. 2013). We apply the "most exacting scrutiny to regulations that suppress, disadvantage, or impose different burdens on speech because of its content." *Id.*

To satisfy such a strict scrutiny review, a statute that regulates speech must be necessary to serve a compelling state interest and be narrowly drawn. *Id.* To be considered narrowly drawn, a law must employ the least restrictive means to achieve its goal and a close nexus must exist between the state's compelling interest and the restriction. *Id.* The statute does not survive strict scrutiny review if there is a less restrictive means of meeting the state's compelling interest that would be at least as effective as the statute under review. *Id.* at 15-16. The parties agree that § 255.004(b) burdens core political speech. The Supreme Court has recognized that speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. *See Buckley* v. *Valeo*, 424 U.S. 1, 14-15 (1976) ("Discussion of public issues and debate on the qualifications of candidates are integral to

the operation of the system of government established by our Constitution"); *see also Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, (1971)) (holding that the First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office.").

Therefore, laws that burden political speech are "subject to strict scrutiny," which requires the Government to prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U. S. 721, 734 (2011) (quoting *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464 (2007) (observing that restrictions constituted "ban on speech" and that bans on political speech are subject to strict scrutiny).

## 2.  APPLICATION

Because section 255.004(b) is a content-based restriction on protected speech, it is subject to strict-scrutiny review to determine if the State has overcome the presumption of invalidity. *Playboy Entm't Grp., Inc.*, 529 U.S. 803 at 813 ("a content-based speech restriction" may stand "only if it satisfies strict scrutiny"). The strict scrutiny analysis requires the State to identify "an actual problem in need of solving," and to show that the measure be employed only where it is necessary to serve the compelling issue to justify suppressing speech. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011); *see also R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992).

I.      Section 255.004(b) cannot survive strict scrutiny.

a. Analysis of Texas Election Code § 255.004(b)

To satisfy strict scrutiny, a law that regulates speech must be necessary to serve a compelling state interest and must be narrowly drawn. *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). Using the statute's plain language and legislative history as an aid, the State argues the § 255.004(b)'s ("True Source statute") specific purpose within the Act was to "outlaw" what the Legislature identified as "dirty tricks relating to campaign communications."[2] Therefore, according to the State, the Legislature identified the government's interest as preventing certain dishonest conduct that is harmful to the democratic elections process. The State contends the court of appeals wrongly focused its inquiry on whether the statute was "narrowly tailored to prevent false speech or misrepresentations" which was a broader and more general goal than the government interest which the True Source statute serves. Instead, so argues the State, the statute neither attempts to prevent "false speech," nor general "misrepresentations," but instead targets a specific type of misrepresentation that harms the democratic elections process. The State concludes that by analyzing whether the statute was narrowly tailored to an erroneously broad government interest, the court of appeals gave itself no choice but to determine that other less restrictive means were available.

---

[2] In the trial court the State articulated the following as compelling interests: to deter fraud in elections, to ensure "accurate sourcing of information" so "voters receive accurate information about who is speaking," to ensure "that votes are cast free[] from misinformation of this kind," to "prevent voter suppression," to deter "fake news," and, to ensure that "when people are told something that they know that they can rely on that communication."

Here, the State has identified the government's interest as protecting the elections process from a specific type of deception that harms elections. We agree with the court below that the State has a compelling interest in preventing certain dishonest conduct that is harmful to the democratic process. *See Ex parte Stafford*, 667 S.W.3d. at 525. But the analysis does not end here. It is not enough that the governmental ends are compelling, the means to achieve those ends must be narrowly drawn to achieve those ends. *Ex parte Lo*, 424 S.W.3d at 19 (citing *Sable Communications of California, Inc.*, 492 U.S. 126). To reach this conclusion we must turn to the "narrow tailoring" prong of the analysis.

In the context of a First Amendment challenge, a statute is narrowly drawn if it "uses the least restrictive means of achieving the government interest." *See Ex parte Thompson*, 442 S.W.3d 325, 344 (Tex. Crim. App. 2014). Because it burdens core political speech, the True Source statute is subject to exacting scrutiny and can be upheld only if it is narrowly tailored to serve an overriding state interest. *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995). While the government may have legitimate aims in passing a statute, they are almost never sufficient to overcome "the practically universal agreement that the major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

Although the State has a compelling interest in fair and honest elections and preventing fraud on the electorate, the statute is not narrowly tailored to achieve that goal. Determining whether a statute is narrowly tailored or "reaches too far" starts with an analysis of what the statute covers. *See Ex parte Perry*, 483 S.W.3d 884, 902 (Tex. Crim.

App. 2016). Courts reviewing a statute must give effect to the plain meaning of the statute's language unless that language is ambiguous or the plain meaning leads to absurd results that the Legislature could not have intended. *Id.*

The True Source statute states:

> A person commits an offense if, with intent to injure a candidate or influence the result of an election, the person knowingly represents in a campaign communication that the communication emanates from a source other than its true source.

TEX. ELEC. CODE § 255.004(b).

When interpreting statutes, Texas courts focus on the statute's literal text. *Watkins v. State*, 619 S.W.3d 265, 271-72 (Tex. Crim. App. 2021). Courts do not focus solely upon a discrete provision, but rather look at other statutory provisions as well to harmonize text and avoid conflicts. *Id*. at 272. Courts read words and phrases in context and construe them according to rules of grammar. *Yazdchi v. State*, 428 S.W.3d 831, 837 (Tex. Crim. App. 2014). Each word, phrase, clause, and sentence should be given effect if reasonably possible. *State v. Hardy*, 963 S.W.2d 516, 520 (Tex. Crim. App. 1997).

The State argues the court of appeals disregarded the statute's plain language and erroneously read a duty to cite a source into the statute. Specifically, the State argues that the statute's plain language does not require identification of the true source, nor does it compel speech. Instead, it prohibits identifying a *false* source. The State construes this statute to say that a person commits an offense only if they affirmatively and explicitly lie about who is making the communication.

The State directs us to the text of the statute and argues all the statute requires is: (1) a party must knowingly lie about the source of a campaign communication; (2) the lie must be made within the communication itself; and (3) the party must intend to influence an election or harm a candidate by lying about that source. The State notes that, on its face, it imposes no identification requirement.

To achieve that end, according to the State, the True Source statute imposes only a simple restriction: do not distribute campaign communications pretending to originate from someone else with intent to harm. We do not disagree that the government's interest in protecting the election process may be of sufficient importance to outweigh possible infringement on constitutional rights, see *Buckley v. Valeo,* 424 U.S. 1, 66-7, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976), however we must also analyze whether the burden placed on the right to freedom of speech under the True Source statute is sufficiently narrow and imposes as few restrictions as possible to meet the state's goals.

While the government's interest to protect voters from confusion, fraud, and undue influence by preventing misleading communications is certainly compelling, we agree with the court of appeals that 255.004(b) encompasses communications that are not arguably false or misleading and it is not narrowly tailored to achieve the interests advanced by the State.

There are four clauses of the True Source Statute that cause the statute to not be narrowly tailored: (i) intent "to injure a candidate or influence the result of an election;" (ii) "represents"; (iii) "in a campaign communication;" and (iv) "true source."

i.     Intent to "injure a candidate or influence the result of an election."

Speech prohibited by the True Source statute must be expressed with the intent to "injure a candidate or influence the result of an election." TEX. ELEC. CODE § 255.004(b). The government may have legitimate aims in passing a statute, but they are almost never sufficient to overcome "the practically universal agreement that the major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The arena of governmental affairs "includes discussions of candidates, structures, and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Id.* at 218-19. Given that influencing elections is the essence of political speech, it is difficult to imagine what speech would not be included under the statute including neutral statements (i.e., "Vote in the primary election this Saturday!") and true statements (i.e., "If you are wondering whether or not you should vote in the Presidential Election, the State of California has more registered voters than any other state."). And while false statements or parody (i.e., any *Babylon Bee* headline) are not exempt from this statute, those statements are probably protected under the First Amendment. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (holding the First Amendment protects even false statements damaging to public figures). This language is too broad and encompasses too many statements that have the potential to influence the democratic process. A citizen should not have to rely on the sense of humor, kindness, or leniency of prosecutors when discussing or sharing opinions and messages regarding governmental affairs.

ii.    "Represents" and "in a campaign communication."

A person violating the True Source Statute "knowingly represents . . . that the communication emanates from a source other than its true source." TEX. ELEC. CODE § 255.004(b). The code does not define the word "represents." Speech prohibited by the True Source statute must be conveyed via a "campaign communication." TEX. ELEC. CODE § 255.004(b). This is defined in the statute as a "written or oral communication *relating to* a campaign." TEX. ELEC. CODE § 501(17) (emphasis added). This definition is problematic because the statement does not even need to explicitly reference a campaign, it only needs to "relate" to one. And whether a statement relates to a campaign is determined by the recipient's interpretation of the message. And once again, someone making an innocuous statement that is interpreted by another as a campaign communication should not be beholden to the sense of humor, kindness, or leniency of the local prosecutor.

iii.    "True Source"

Speech prohibited by the True Source statute must be represented to emanate from a source other than its "true source." Because this phrase is not defined, the Fifth Court of Appeals asked:

> Is a "true source" the original source? Is it an accurate communication made by one other than the original source that is in accord with facts and reality? According to the State, the determination of a true source is a fact-specific inquiry. But relying on ad hoc factual inquiry to determine whether speech is prohibited simply underscores the extent to which the expansive scope of the statute captures significant amounts of protected speech far beyond the interests the state seeks to advance.

*Stafford*, 667 S.W.3d at 531. While the State argues that identifying a "true source" will prevent the speaker from affirmatively and explicitly lying about who makes the communication, correctly identifying a source does not make a statement more or less dishonest. *See Stafford,* 667 S.W.3d at 528 ("Of course, the identity of a source can be helpful in evaluating ideas. But the State cannot reasonably argue that providing this additional information makes a fraudulent or untrue statement any less so. A false statement is still false even if the source is disclosed. And it is well-established that "if authority is to be reconciled with freedom," the remedy for speech that is false is speech that is true. *See Whitney v. California*, 274 U.S. 357, 377, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring).).

If the State's primary interest is about dishonest conduct in elections and campaigns, the Misrepresentation of Identity statute already covers that. That statute states:

> A person commits an offense if, with intent to injure a candidate or influence the result of an election, the person misrepresents the person's identity or, if acting or purporting to act as an agent, misrepresents the identity of the agent's principal, in political advertising or a campaign communication.

TEX. ELEC. CODE § 255.005. This statute specifically targets a "dirty trick" of dishonesty in the source of a campaign communication because there must be an overt (i.e., affirmative and/or explicit) misrepresentation. But the True Source statute does not serve that same purpose. It contains no language limiting its application to false statements. Nor does it prevent misrepresentations and false statements. While the State tries to justify the statute as a means of preventing dirty tricks, the statute here criminalizes protected anonymous and truthful political speech and has the chilling effect of impermissibly

restricting engagement in political discourse. Therefore, because there are narrower means of achieving the State interests, one of which being § 255.005, this statute is unconstitutional.

The court of appeals reasoned that Election Code § 255.005 (the Misrepresentation of Identity statute) already served the State's interest by prohibiting misleading statements in a political campaign. *Stafford*, 667 S.W.3d at 527. The court of appeals further reasoned that the Misrepresentation of Identity statute was more specific than the True Source statute because "[§ 255].005 prohibits misrepresentations, while [the True Source statute] prohibits *representations of all types*." *Id*. (emphasis added). The State argues this failing of the intermediate court to understand the difference between the True Source statute and the Misrepresentation of Identity statute resulted in the intermediate court giving itself no choice but to erroneously determine that a less restrictive means was available in the form of the Misrepresentation of Identity statute. The State continues that these two statutes actually "work in concert with each other to prohibit the two specific 'dirty tricks'" (misrepresenting his/her own identity and misrepresenting the source of the communication itself) which can confuse voters and harm the elections process. We disagree.

The analysis conducted by the intermediate court is not dissimilar to the Supreme Court's analysis in *McIntyre*. In *McIntyre*, the Supreme Court analyzed and declared unconstitutional an Ohio statute that prohibited anonymous communications about political issues. *McIntyre*, 514 U.S. at 338 (citing Ohio Rev. Code Ann. § 3599.09(A)).

Similar to the State in this case, Ohio cited two state interests supporting passage of the statute: (i) its "interest in preventing fraudulent and libelous statements" and (ii) its "interest in providing the electorate with relevant information." *Id.* at 348.

The *McIntyre* Court agreed that the State of Ohio had a legitimate interest in preventing fraudulent and libelous statements. *Id.* at 349. However, the Court noted that Ohio had other statutes already addressing fraud prevention that did not target political speech. *Id.* The State's "assuredly legitimate" interest nevertheless failed to justify the statute's "extremely broad prohibition." *Id.* at 351. The Court continued:

> Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its nature will sometimes have unpalatable consequences, and, in general*, our society accords greater weight to the value of free speech than to the dangers of its misuse*. Ohio has not shown that its interest in preventing the misuse of anonymous election-related speech justified a prohibition of all uses of that speech. The State may, and does, punish fraud directly. But it cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented.

*Id.* at 357 (citations omitted) (emphasis added).

Turning to the True Source statute, if the State's interest is in preventing certain dishonest conduct that is harmful to the democratic elections process, we fail to see how the True Source statute serves that interest. First, as discussed *supra*, this statute is not directed at dishonest conduct and, in fact, criminalizes truthful political messages. The

State cannot justify this broad prohibition on forms of legitimate political speech created by the True Source Statute. Second, while the State attempts to construe this statute to say that a person commits an offense only if he or she affirmatively or explicitly lies about who is making the communication, this is not accurate. By its own admission, the State claims that that the True Source statute does not require identification of a source. Therefore, this statute not only criminalizes anonymous[3] speech, but also criminalizes assumed names and omissions such as an author deciding not to disclose his or her identity for fear of retaliation or privacy concerns. *See McIntyre*, 514 U.S. at 342 (holding "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.").

II.     The appellate court did not incorrectly rely on an inadequate less-restrictive means.

Finally, the State argues the court of appeals erred by determining that the State did not "dispel the generally accepted proposition that counter speech may provide a less restrictive means of advancing the State's interests." *Stafford*, 667 S.W.3d at 528. According to the State, "when a party makes certain fraudulent representations bordering on identity theft, the damage is done once the message is relayed. More speech will not necessarily undo the damage, particularly in the time sensitive environment of a political campaign."

---

[3] The definition of "anonymous" is "not named or identified." Webster's Ninth New Collegiate Dictionary 88 (1983). Arguably, this definition could include unsigned communications or the use of a false or fictious name.

We acknowledge that "the remedy for speech that is false is speech that is true." *See United States v. Alvarez*, 567 U.S. 709, 727 (2012) (plurality op.) (quoting *Whitney* v. *California*, 274 U.S. 357, 377, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.")). However, counter speech as applied to the True Source statute might not be a less restrictive means of advancing the State's interest. The State's argument highlights the fatal flaw with this statute: the True Source statute encompasses communications that are not arguably false or misleading and it is not narrowly tailored to achieve the interests advanced by the State because there is no requirement of materiality. It criminalizes anonymous, un-signed, and factually accurate political communications. There is no exception for social media reposts. The statute also lends itself to prosecuting anonymous communications and even imitation, impersonation, sarcasm, parody, surrogacy, or pen names because it is subject to an individual's perception of the communication. But the State would still have the prosecutorial discretion under the True Source statute to indict under these facts.

## CONCLUSION

We hold that § 255.004(b) on its face, violates the First Amendment to the United States Constitution and affirm the Fifth Court of Appeals' opinion reversing the trial court's order.

Delivered: September 4, 2024

Publish